## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| JANE DOE, individually, and on behalf of all others similarly situated, | ) ) ) |
| **Plaintiff** | ) ) ) |
| v. | ) Case No. _____ |
| GENESIS HEALTH SYSTEM, | ) ) ) |
| **Defendant.** | ) ) ) ) |

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff, Jane Doe, individually, and on behalf of all others similarly situated, (hereinafter "Plaintiff") brings this Class Action Complaint against Defendant Genesis Health System (hereinafter "Genesis Health" or "Defendant"), and alleges, upon personal knowledge as to her own actions, and upon information and belief as to all other matters, as follows.

## INTRODUCTION

1.      Plaintiff brings this class action to address Defendant's improper practice of disclosing the confidential Personally Identifying Information ("PII")[1] and/or Protected Health Information ("PHI")[2] (collectively referred to as "Private Information") of Plaintiff and the

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information.* "Business Health information such as diagnoses, treatment information,

proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"),[3] and potentially others ("the Disclosure") via tracking technologies used on its website.

2.     The Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites or online platforms, such as Defendant's, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[4] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[5] OCR and FTC warn that "[i]mpermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation,

---

medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020).  Genesis Health is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

[3] Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. in October 2021. Plaintiff's reference to both "Facebook" and "Meta" throughout this complaint refer to the same company.

[4] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[5] *Id.*

health, or physical safety of the individual or to others."[6]

3.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

4.      Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, <u>no health care provider may disclose a person's personally identifiable protected health information to a third party without express written authorization</u>.

5.      "Genesis Health System serves a 17-county bi-state region of the Quad Cities (Davenport and Bettendorf, Iowa, and Rock Island and Moline, Ill.) metropolitan area and the surrounding communities of Eastern Iowa and Western Illinois."[7]  Genesis Health is "one of the largest employers in the Quad Cities, with more than 5,000 employees."[8]

6.      Despite its unique position as a massive and trusted healthcare provider, Genesis

---

[6] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **attached as Exhibit A.**
[7] https://www.genesishealth.com/about/
[8] *Id*.

Health knowingly configured and implemented into its website, genesishealth.com, (the "Website") code-based tracking devices known as "trackers" or "tracking technologies," which collected and transmitted Plaintiff and Class Members' Private Information to Facebook, Google, and other third parties, without their knowledge or authorization.

7.      Defendant encourages patients to use its Website, along with its various web-based tools and services (collectively, the "Online Platforms"), to search for physicians, locate healthcare facilities, learn about specific health conditions and treatment options, pay bills, sign up for classes and events, and more.

8.      When Plaintiff and Class Members used Defendant's Website and Online Platforms, they thought they were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded tracking technologies from Facebook, Google, and others into its Website and Online Platforms, surreptitiously forcing Plaintiff and Class Members to transmit intimate details about their medical treatment to third parties without their consent.

9.      Facebook's tracker is called the Meta Pixel (also referred to as the "Pixel"). The Meta Pixel is a snippet of code, embedded into a website, that tracks information about its visitors and their website interactions.[9] As a visitor uses the website, the Meta Pixel records any "events" it is configured to track, such as pages viewed, buttons clicked, and information submitted.[10] Then, the Pixel transmits the event information back to the website server and to Facebook, where it can be combined with other data and used for marketing.[11]

---

[9] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[10] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[11] *Id.*

10.     By default, the Meta Pixel tracks information about a website user's device and the URLs and domains they visit.[12] When configured to do so, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[13] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[14]

11.     Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiff and Class Members' private health information, alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

12.     Facebook encourages and recommends that website owners who use the Metal Pixel also employ a Business Tool called Conversions Application Programming Interface ("CAPI").[15]

13.     Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interactions from the website owner's

---

[12] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 22, 2023).

[13] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).

[14] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

[15] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Jan. 25, 2023).

private servers, which transmits the data directly to Facebook, without involvement from the website user's browser.[16, 17]

14.    Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Facebook directly. For this reason, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[18]

15.    Defendant utilized data from these trackers to market its services and bolster its profits. Facebook utilizes data from the Meta Pixel and CAPI to build data profiles for the purpose of creating targeted online advertisements and enhanced marketing services, which it sells for profit.

16.    The information that Defendant's Meta Pixel and possibly CAPI sent to Facebook included Private Information that Plaintiff and Class Members submitted to Defendant's Website, including, for example, the parameters of their doctor searches, the contents of their search queries, their searches for medical searches, their pre-portal activity, and, more, including the pages they visited, and the buttons that they clicked.

17.    Such information allows third parties (e.g., Facebook) to learn that a particular

---

[16]    What is the Facebook Conversion API and How to Use It, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/ (last updated May 20, 2022).
[17]    "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." Conversions API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited May 15, 2023).
[18]    About Conversions API, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).

individual's health conditions and seeking of medical care. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers, who then target Plaintiff and Class Members with online advertisements, based on the information they communicated to Defendant via the Website. Facebook and any third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

18.    Healthcare patients simply do not anticipate that their trusted healthcare provider will send their private health information to a hidden third party—let alone Facebook, a company with a sordid history of violating consumer privacy in pursuit of ever-increasing advertising revenue—without their consent.

19.    Neither Plaintiff nor any Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or any other third parties uninvolved in their treatment.

20.    Despite willfully and intentionally incorporating the Meta Pixel, potentially CAPI, and other third-party trackers into its Website and servers, Genesis Health has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with third parties including Facebook and possibly others.

21.    Defendant further made express and implied promises to protect Plaintiff and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant, including in its privacy policies and elsewhere.

22.    Defendant owed common law, statutory, and regulatory duties to keep Plaintiff's and Class Members' communications and Private Information safe, secure, and confidential.

23.    Upon information and belief, Genesis Health utilized the Meta Pixel and other

tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

24.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard their information from unauthorized disclosure.

25.     Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, *inter alia*: (i) failing to adequately review its marketing programs and web-based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook and others; (v) failing to protect Private Information and take steps to block the transmission of Plaintiff's and Class Members' Private Information through the use of Meta Pixel and other tracking technology;  (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

26.     Plaintiff seeks to remedy these harms and brings causes of action for (I) Negligence, (II) Invasion of Privacy, (III) Breach of Implied Contract, (IV) Unjust Enrichment; (V) Breach of Fiduciary Duty, and (VI) Violation of the Illinois Consumer Fraud and Deceptive Practices Act (CFDPA), 815 Ill. Comp. Stat. § 505/1 *et seq*.

**PARTIES**

27.     Plaintiff, Jane Doe, is a natural person and a resident and citizen of Illinois, where she intends to remain, with a principal residence in Moline, Illinois, in Rock Island County. She is

a patient of Genesis Health and a victim of Defendant's unauthorized Disclosure of Private Information.

28.    Defendant Genesis Health System is a non-profit corporation organized and existing under the laws of the State of Iowa with its principal place of business at 1227 East Rusholme, Davenport, Iowa.

## JURISDICTION AND VENUE

29.    This Court has personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in Illinois and committed tortious acts in Illinois.

30.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than one hundred (100) members in the proposed Class, and at least one member of the class is a citizen of a state different from Defendant.

31.    The Court has supplemental jurisdiction over Plaintiff's claims arising under state law under 28 U.S.C. § 1367.

32.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## COMMON FACTUAL ALLEGATIONS

### A. Background

33.    Genesis Health, headquartered in Davenport, Iowa is "one of the largest employers in the Quad Cities."[19]  "Genesis Health System, its affiliates and partners, offer a continuum of health care services. [Its] affiliates include: hospital care at Genesis Medical Center, Davenport

---

[19] https://www.genesishealth.com/about/ (last accessed Nov. 17, 2023).

and DeWitt, Iowa and at Genesis Medical Center, Silvis and Genesis Medical Center, Aledo, Ill.; home health and hospice services through Genesis VNA and Hospice; Genesis Workplace Services; the Clarissa C. Cook Hospice House; senior living communities in partnership with WesleyLife; Genesis Health Group, with more than 300 health care providers; the Genesis Quad Cities Family Medicine Residency program; Genesis Psychology Associates; Genesis Convenient Care clinics; and, Genesis Home Medical Equipment. Partners include Crow Valley Surgery Center, Bettendorf; Center for Digestive Health, Bettendorf; Spring Park Surgery Center, Davenport; and, Genesis Imaging Centers. Genesis manages Jackson County Regional Health Center, Maquoketa, Iowa."[20]

34.    Genesis Health serves many of its patients via its Website and Online Platforms, which it encourages patients to use to find a doctor or location, schedule an appointment, learn about health conditions and treatment, pay bills, access the patient portal, take health risk assessments, and more.

35.    Genesis Health promotes the convenience and functionality of its Website and Online Platforms, encouraging patients to check in online and "skip the waiting room."[21] "[s]ave time, check-in online" and "consult with a doctor by web or phone using the "Genesis Convenient CareNow App."[22]

36.    In furtherance of its goal of expanding its marketing efforts and increasing profits, Defendant purposely installed the Meta Pixel and other trackers onto its Website to gather Private Information about Plaintiff and Class Members. But Defendant did not only generate information

---

[20] *Id.*
[21] https://www.genesishealth.com/a-z/right-care/convenientcare-emergency-services/convenient-care/online-check-in/ (last accessed Nov. 17, 2023)
[22] https://www.genesishealth.com/a-z/right-care/convenientcare-emergency-services/convenient-care/convenient-carenow-online/ (last accessed Nov. 17, 2023).

for its own use: it also shared patient Private Information, including that belonging to Plaintiff and Class Members, with Facebook, Google, and potentially other unauthorized third parties.

37.     To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.

### i.     *Facebook's Business Tools and the Meta Pixel*

38.     Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[23]

39.     In conjunction with its advertising business, Facebook encourages website owners like Defendant to use its "Business Tools" to gather customer data, identify customers and potential customers,, and market products and services.

40.     Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

41.     The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, clicks a button, fills out a form, and more.[24] Businesses that want to target customers and advertise their services can also create their own tracking parameters by building a "custom event."[25]

---

[23] Meta Reports Fourth Quarter and Full Year 2021 Results, FACEBOOK  https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022).
[24] Specifications for Facebook Pixel Standard Events, META, https://www.facebook.com/business/help/402791146561655 (last visited Jan. 31, 2023); *see also* Facebook Pixel, Accurate Event Tracking, Advanced, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; App Events API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Jan. 31, 2023).
[25] About Standard and Custom Website Events, META, https://www.facebook.com/business/help/964258670337005; *see also* Facebook, App Events API, *supra*.

42.    One such Business Tool is the Meta Pixel, a tool that "tracks the people and type of actions they take."[26] When an individual accesses a webpage that is hosting the Meta Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook—traveling directly from the user's browser to Facebook's server, based off instructions from the Meta Pixel.

43.    Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy, such as a homepage, and disable it on pages that do implicate patient privacy, such as Defendant's "Find a Doctor" page.

44.    The Meta Pixel's primary purpose is to enhance online marketing, improve online ad targeting, and generate sales.[27]

45.    Facebook's own website informs companies that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[28]

46.    According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** [Emphasis added.]

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send

---

[26] Retargeting, META, https://www.facebook.com/business/goals/retargeting.
[27] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[28] About Meta Pixel, META,
https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).

additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[29]

47.     Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.

- **Drive more sales**. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[30]

48.     Facebook likewise benefits from Meta Pixel data and uses it to enhance its own ad targeting abilities.

>    *ii.    **Defendant's method of transmitting Plaintiff's and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel***

49.     Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

50.     Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users'

---

[29] Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[30] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).

client devices via their web browsers.

51.    Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[31]

52.    GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

53.    When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information. The entity's servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

54.    Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

55.    Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

56.    In this way, the Meta Pixel acts much like a traditional wiretap, intercepting and transmitting communications intended only for the website host and diverting them to Facebook.

57.    Separate from the Meta Pixel, Facebook and other third parties place cookies in the

---

[31]"Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

web browsers of users who visit their websites or online platforms. These cookies can uniquely identify the user, allowing the third party to track the user as they browse the internet—on the third-party site and beyond. Facebook uses its own cookie to identify users of a Meta-Pixel-enabled website and connect their activities on that site to their individual identity. As a result, when a Facebook account holder uses a website with the Meta Pixel, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the user associated with the information it has intercepted.

58.    With substantial work and technical know-how, internet users can sometimes circumvent these browser-based wiretap technologies. To counteract this, third parties bent on gathering data implement workarounds that are difficult for web users to detect or evade. Facebook's workaround is Conversions API, which "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."[32] This makes Conversions API a particularly effective tool because it allows sends Facebook data directly from the website server to Facebook, without relying on the user's web browser. Notably, client devices do not have access to host servers containing Conversions API, and thus, they cannot prevent (or even detect) this transmission of information to Facebook.

59.    While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the website server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with Facebook] that the pixel may lose."[33]  Consequently, if a website owner utilizes the

---

[32] About Conversions API, META, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).
[33] See Best Practices for Conversions API, META, https://www.facebook.com/business/help/308855623839366 (last visited May 15, 2023).

Meta Pixel on its website, it is also reasonable to infer that it implemented the Conversions API on its website server(s), in accordance with Facebook's documentation.

60.    The Meta Pixel, Conversions API, and other third-party trackers do not provide any substantive content on the host website. Rather, their only purpose is to collect information to be used for marketing and sales purposes.

61.    Accordingly, without any knowledge, authorization, or action by a user, a website owner can use its website source code to commandeer its users' computing devices and web browsers, causing them to invisibly re-direct the users' communications to Facebook, Google, or others.

62.    In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

63.    Consequently, when Plaintiff and Class Members visited Defendant's Website and communicated their Private Information, it was simultaneously intercepted and transmitted to Facebook.

64.    Genesis Health also employed trackers from Google Analytics. On information and belief, Defendant likewise transmitted Plaintiff's and the Class Members' Private Information to these third parties without Plaintiff's and Class Members' knowledge or authorization.

### iii.    Defendant's Privacy Policies Prohibit the Use and Disclosure of Private Information without Authorization

65.    Genesis Health maintains a (1) "Notice of Privacy Practices" ("Notice"),[34] (2)

---

[34]*See* Genesis Health Notice of Privacy Practices, available at
https://www.genesishealth.com/app/files/public/f49ccf84-e087-4292-980f-
40c10ad91f80/Notice%20of%20Privacy%20Practices%20Brochure.pdf (last accessed Nov. 17, 2023)
(**attached as Exhibit B).**

"Privacy Policy"[35] and (3) "Patient Rights and Responsibilities"[36] (collectively, the "Privacy Policies"). Genesis Health maintains and posts copies of each of these policies on its Website.

66.    The Notice makes the following acknowledgement: "We are required by law to maintain the privacy of your PHI and to provide you with this Notice of our legal duties and privacy practices concerning your PHI. When we use or disclose your PHI, we are required to abide by the terms of this Notice[.]"

67.    In Section III of the Notice, Genesis Health provides, "[t]his notice describes how medical information about you may be used and disclosed and how you can get access to this information."[37] The Notice enumerates several standard ways in which hospitals use medical information without patient authorization, such as for treatment, payment, health care operations, public health, abuse reporting, and oversight activities.[38]

68.    The Notice goes on to state that "[f]or any purpose other than those described above in Section III, we will only use or disclose your PHI with your written authorization."[39] Genesis Health explicitly states, "**Most uses and disclosures of PHI for marketing purposes will be made only with your written authorization.**"[40]

69.    Furthermore, the Patient Rights and Responsibilities acknowledges that patients have that right to:

- *privacy*. The hospital, your doctor and others caring for you will protect your privacy and can limit your visitors to individuals you authorize.

---

[35] *See* Privacy Policy, available at https://www.genesishealth.com/privacy/ (last accede Nov. 17, 2023) (**attached as Exhibit C).**
[36] *See* Patient Rights and Responsibilities, https://www.genesishealth.com/rights/ (last accessed Nov. 17, 2023) **(attached as Exhibit D).**
[37] **Exhibit B.**
[38] *Id.*
[39] *Id.*
[40] *Id.* (emphasis added).

- **_expect that treatment records are confidential_** unless you have given permission to release information or reporting is required or permitted by law. When the hospital releases records toothers, such as insurers, it emphasizes that the records are confidential.
  .
  .
  .

- **_know if the hospital has relationships with outside parties_** that may influence your treatment and care.[41]

70.    Meanwhile, Genesis Health's Privacy Policy makes the following statements:

## A.  Personally-Identifiable Information:

Through our website or Patient Portal application, we may collect information by which you may be personally identified, such as first and last name, home and email address, account password, telephone number, social security number, alternative names, or insurance information ("personal information"); Genesis Health System typically receives specific data about its Website visitors only when such information is provided voluntarily, such as when our visitors request information, purchase or enroll for services, arrange for scheduling, make donations, request patient portal access, provide resume information for employment opportunities, or send us e-mail. Of course, some of these activities require that you give us information, such as when you make a purchase, use a credit card to pay for services, submit your resume, or request certain types of information. When you provide personally identifiable information to Genesis Health System through one of our Websites, it will be used to fulfill your specific request.

In most cases, you will be given the opportunity to select whether you do, or do not, want Genesis Health System to use this information for additional purposes.

\* \* \* \* \*

## B. Non Personally-Identifiable Information:

Genesis Health System gathers some information automatically about the Internet address assigned to your computer, the number and frequency of visitors, and the Genesis Health System sites visited. Genesis Health System gathers this information for the limited purpose of determining customer service and Web site needs. We accomplish this by using certain technologies, including "cookies" (a technology that can be used to provide the visitor with tailored information about Genesis Health System services). Genesis Health System does not combine

---

[41] **Exhibit D.**

information collected in this way with any personally-identifiable information.[42]

### iv.   *Defendant Disclosed Plaintiff and Class Members' Private Information in Violation of its Own Privacy Policies*

71.   Despite the above representations in its Privacy Policies, Defendant did, in fact, disclose Private Information to third parties for marketing purposes.

72.   Despite the above representations in its Privacy Policies, Defendant did, in fact, combine patients' personally identifiable information with patient's health information and disclosed it to Facebook, Google, and potentially others.

73.   Nowhere throughout the Privacy Policies does Genesis Health mention or disclose to its patients the fact that it implements the Facebook or Google Analytics tracking Pixels and sends patient PHI to Facebook, Google, and potentially others.

74.   Through its use of the Meta Pixel, Genesis Health disclosed to Facebook Plaintiffs and Class Members' Private Information communicated via its Website, including content website users viewed; the buttons they clicked and forms they submitted; the terms they searched; and the doctors they sought.

75.   In addition to this information, the Meta Pixel collects and transmits to Facebook identifying information, including the website visitor's IP address, browser and device information, and, if applicable, their Facebook ID. Combined with information about Plaintiffs' specific medical conditions and treatments, this information constitutes Private Information, or PHI.

76.   For example, Genesis Health installed and utilized the Meta Pixel on users' searches, such as, to find a doctor:

---

[42] **Exhibit B.**



```
</> Meta Pixel                              Troubleshoot Pixel
    Pixel ID: 381489502466903 click to copy  Set Up Events  New!

▼ ● PageView

    EVENT INFO

    Setup Method: Manual
    URL called:  Hide

      https://www.facebook.com/tr/?id=381489502466903&ev=PageVie
      w&dl=https%3A%2F%2Fwww.genesishealth.com%2Fdoctor%2F&rl=ht
      tps%3A%2F%2Fwww.genesishealth.com%2F&if=false&ts=168071357
      4670&sw=1920&sh=1080&v=2.9.100&r=stable&ec=0&o=28&cs_est=t
      rue&fbp=fb.1.1680713520033.490440971&it=1680713574579&coo=
      false&rqm=GET

    Load Time: 8.17 ms
    Pixel Code:  Hide

      <noscript><img height="1" width="1" style="display:none" s
      rc="https://www.facebook.com/tr?id=381489502466903&amp;ev=
      PageView&amp;noscript=1
      https://www.facebook.com/tr?id=381489502466903&amp;ev=Page
      View&amp;noscript=1
      "></noscript>

    Pixel Location:  Hide

      https://www.genesishealth.com/doctor/

    Frame: Window
```

77.    When a patient visits Defendant's Website and searches for a doctor, the individual's browser sends a request to Defendant's server requesting that it load the webpage. Then, Meta Pixel sends secret instructions back to the individual's browser, causing it to imperceptibly record the patient's communication with Genesis Health and transmit it to Facebook's servers alongside personally identifying information, such as the patient's IP address. Thus, any Website page a patient visits is then reported back to Facebook, alongside information identifying the patient.

78.    This is likewise the process for the pixels installed on Defendant's pages used to find medical services,[43] and on the pre-portal login page to access the patient portal.[44]

---

[43] E.g., Genesis Health System Services A-Z https://www.genesishealth.com/a-z/
[44]  https://www.genesishealth.com/mygenesis-home/

79.    After receiving this information from Defendant, Facebook processes it, analyzes it, and assimilates it into its own massive datasets, before selling access to this data in the form of targeted advertisements. Employing "Audiences"—subsections of individuals identified as sharing common traits—Facebook promises the ability to "find the people most likely to respond to your ad."[45] Advertisers can purchase the ability to target their ads based on a variety of criteria: "Core Audiences," individuals who share a location, age, gender, and/or language;[46] "Custom Audiences," individuals who have taken a certain action, such as visiting a website, using an app, or buying a product bought a product;[47] and/or "Lookalike Audiences," groups of individuals who "resemble" a Custom Audience, and who, as Facebook promises, "are likely to be interested in your business because they're similar to your best existing customers.[48]

80.    Google and other companies process data in a similar manner and use it to build marketing and other data profiles allowing for targeted online advertising.

81.    Defendant could have chosen not to use the Meta Pixel, or it could have configured it to limit the information that it communicated to Facebook, but it did not. Instead, it intentionally selected and took advantage of the features and functionality of the Pixel that resulted in the Disclosure of Plaintiffs' and Class Members' Private Information.

82.    Defendant used and disclosed Plaintiff's and Class Members' Private Information to Facebook, Google, and other third parties for the purpose of marketing its services and increasing its profits.

83.    On information and belief, Defendants shared, traded, or sold Plaintiff's and Class

---

[45] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).
[46] *Id.*
[47] *Id.*
[48] How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Help Center, https://www.facebook.com/business/help/465262276878947 (last visited Aug. 14, 2023).

Members' Private Information with Facebook, Google, and others in exchange for improved targeting and marketing services.

84.     Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information for marketing purposes. Plaintiff was never provided with any written notice that Defendant regularly disclosed its patients' Protected Health Information to Facebook, Google, and others, nor were they provided any means of opting out of such disclosures. Defendant, nonetheless, knowingly disclosed Plaintiff's Protected Health Information to unauthorized entities and used that information for its own gain.

85.     Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

86.     Defendant misrepresented that it would preserve the security and privacy of Plaintiff's and Class Members' Private Information, while, in actuality, it was knowingly disclosing this information to unauthorized third parties.

87.     By law, Plaintiff and the Class Members are entitled to privacy in their Protected Health Information and confidential communications. Genesis Health deprived Plaintiff and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications, Personally Identifiable Information, and Protected Health Information; (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook, Google, and others; (3) profited from the Disclosure; and (4) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

**B.  Plaintiff's Experience**

88.     Plaintiff Jane Doe has been a patient of Defendant for 30 years and has received healthcare services from Genesis Health and physicians in Genesis Health's network. She has been treated at Defendant's Moline, Illinois location.

89.     Plaintiff relied on Genesis Health's Website and Online Platforms to communicate confidential patient information. She last visited the Website and Online Platforms in September 2023. Plaintiff uses the Website to search for doctors and schedule appointments.

90.     Plaintiff accessed Defendant's Website and Online Platforms at Defendant's direction and encouragement. Plaintiff reasonably expected that her online communications with Genesis Health were confidential, solely between herself and Genesis Health, and that, as such, those communications would not be transmitted to or intercepted by a third party.

91.     Plaintiff provided her Private Information to Defendant and trusted that the information would be safeguarded according to Genesis Health's privacy policies and the law.

92.     By failing to receive the requisite consent to disclose Plaintiff's Private Information, Genesis Health violated its agreements with Plaintiff, its own policies, and the law.

93.     Since using Defendant's Website, Plaintiff has been targeted by online advertisements for prescription medications.

94.     Plaintiff paid for Defendant's healthcare services, which included reasonable privacy and data security protections for Plaintiff's Private Information; however, Plaintiff did not receive the privacy and security protections for which she paid.

95.     Because of Defendant's Disclosure, Plaintiff has suffered injuries, including monetary damages; loss of privacy; unauthorized disclosure of her Private Information; unauthorized access to her Private Information by third parties; use of her Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased

value of her Private Information; lost benefit of her bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of her information.

## C.  Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI

96.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[49] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

97.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data.  The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway.  The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."[50]

98.    The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something

---

[49] Kurt Wagner & Bloomberg, Facebook Admits Another Blunder with User Data, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.
[50] New York State Department of Financial Services, REPORT ON INVESTIGATION OF FACEBOOK INC. DATA PRIVACY CONCERNS, (Feb. 18, 2021) https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.

startling: the company was sharing their data with Facebook.[51] When a user was having their period or informed the app of their intention to get pregnant, Flo would inform Facebook, which could then use the data for targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[52]

99.    More recently, Facebook employees admitted to lax protections for sensitive user data. In 2021, Facebook engineers on the ad business product team conceded "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[53]

100.    In June 2022, an investigation by The Markup[54] revealed that the Meta Pixel was embedded on the websites of 33 of the top 100 hospitals in the nation.[55] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data," including sensitive personal health information, whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[56] The data is connected to an IP address, which is "an identifier

---

[51] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.) https://slate.com/technology/2022/06/health-data-brokers-privacy.html.
[52] Id.
[53] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.
[54] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. See www.themarkup.org/about (last accessed Mar. 19, 2023).
[55] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[56] Id.

that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."[57]

101.  During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also patients' names, addresses, email addresses, and phone numbers.[58]

102.  In addition to the 33 hospitals identified by The Markup that had installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[59]

103.  David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated he was "deeply troubled" by what the hospitals capturing and sharing patient data in this way.[60]

**D.  Defendant Violated HIPAA Standards**

104.  Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[61]

105.  Guidance from the U.S. Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

---

[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

106.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[62]

107.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[63]

108.    In addition, HHS's Office for Civil Rights (OCR) issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[64]

109.    According to the Bulletin, "HIPAA Rules apply when the information that

---

[62] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, (Nov. 26, 2012)
https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.
[63] U.S. Department of Health and Human Services, Marketing, (Dec. 3, 2002)
https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.
[64] *See* U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,
https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."[65]

110.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [66]

111.    In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel violates HIPAA Rules.

## E.    Defendant Violated FTC Standards, and the FTC and HHS Take Action

112.    The Federal Trade Commission ("FTC") has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[67]

---

[65] *Id.*
[66] *Id.* (emphasis in original) (internal citations omitted).
[67]  Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **Exhibit A.**

113.    On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[68]

114.    Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[69] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."[70]

115.    Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id*. According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[71]

116.    Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of

---

[68] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.
[69] *Id.*
[70] *Id.*
[71] Statement of the Commission: On Breaches by Health Apps and Other Connected Devices, U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).

competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[72]

117.    As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

## F. Defendant Violated Industry Standards

118.    A medical provider's duty of confidentiality is a cardinal rule, embedded in doctor-patient and hospital-patient relationships.

119.    The American Medical Association's ("AMA") Code of Medical Ethics requires the protection of patient privacy and communications, and these rules are applicable to Genesis Health and its physicians.

120.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

121.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial

---

[72] *See, e.g.,* U.S. v. Easy Healthcare Corp., Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legallibrary/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; In the Matter of BetterHelp, Inc., FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; U.S. v. GoodRx Holdings, Inc., Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; In the Matter of Flo Health Inc., FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/casesproceedings/192-3133-flo-health-inc.

purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

122.     AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

**G.  Plaintiff's and Class Members' Expectation of Privacy**

123.     At all times when Plaintiff and Class Members provided their Private Information to Defendant, they had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

**H.  IP Addresses are Personally Identifiable Information**

124.     Defendant also disclosed Plaintiff's and Class Members' IP addresses to Facebook, Google, and others through its use of the Meta Pixel and other tracking technologies.

125.     An IP address is a number that identifies the address of a device connected to the Internet.

126.     IP addresses are used to identify and route communications on the Internet.

127.     IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

128.     Facebook tracks every IP address ever associated with a Facebook user.

129.     Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

130.     Under HIPAA, an IP address is Personally Identifiable Information:

31

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code," specifically listing IP addresses as an example of PII. *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

131.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

**I.    Defendant Was Enriched and Benefitted from the Use of Trackers and Unauthorized Disclosures**

132.    The sole purpose for Defendant's use of the Meta Pixel and other tracking technology was to enhance its marketing efforts and increase its profits.

133.    In exchange for disclosing the Private Information of its patients, Defendant was compensated by Facebook, Google, and likely others in the form of enhanced advertising services and more cost-efficient marketing.

134.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

135.    By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

**J.    Plaintiff's and Class Members' Private Information Had Financial Value**

136.    The data concerning Plaintiff and Class Members, collected and shared by Defendant, has tremendous economic value. Data collected via the Meta Pixel, CAPI, and other online tracking tools allows Facebook to build its own massive, proprietary dataset, to which it then sells access in the form of targeted advertisements. Targeting works by allowing advertisers

to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[73] Facebook's "Core Audiences" allow advertisers to target individuals based on demographics, such as age, location, gender, or language, whereas "Custom Audiences" allow advertisers to target individuals who have "already shown interest in your business," by visiting a business's website, using an app, or engaging in certain online content.[74] Facebook's "Lookalike Audiences" go further, targeting individuals who resemble current customer profiles and whom, according to Facebook, "are likely to be interested in your business."[75]

137.     Data harvesting is big business, and it drives Facebook's profit center, its advertising sales. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than 98% of its total revenue for that year.[76]

138.     This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

139.     In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, it described the

---

[73] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).
[74] *Id.*
[75] *See* How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Center, https://www.facebook.com/business/help/465262276878947 (last visited Aug. 14, 2023).
[76] *See* Here's How Big Facebook's Ad Business Really Is, CNN, https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html (last visited Aug. 14, 2023).

extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[77]

140.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[78]

## TOLLING, CONCEALMENT, AND ESTOPPEL

141.    The applicable statutes of limitation have been tolled as a result of Genesis Health's knowing and active concealment and denial of the facts alleged herein.

142.    Genesis Health seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing patients with no indication that their Website usage was being tracked and transmitted to third parties. Genesis Health knew that its Website incorporated Meta Pixel and other trackers, yet it failed to disclose to Plaintiff and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, Google, and potentially others.

143.    Even while exercising due diligence, Plaintiff and Class Members could not have discovered the full scope of Genesis Health's conduct, because there were no disclosures or other indications that they were interacting with websites employing Meta Pixel or any other tracking technology.

144.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Genesis Health's illegal interception and

---

[77] *See* Adam Tanner, How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.

[78] *See* Christina Farr, Hospital Execs Say They are Getting Flooded with Requests for Your Health Data, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

disclosure of Plaintiff's Private Information has continued unabated through the present. What is more, Genesis Health was under a duty to disclose the nature and significance of their data collection practices but did not do so. Genesis Health is therefore, is estopped from relying on any statute of limitations defenses.

## CLASS ALLEGATIONS

145.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

146.    Plaintiff seeks to represent the Nationwide Class (the "Class") defined as follows:

**All individuals whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

147.    Plaintiff also seeks to represent the following Illinois Subclass, defined as:

**All Illinois citizens whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

148.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

149.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

150.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose

Private Information may have been improperly used or disclosed by Defendant, and the Class is identifiable within Defendant's records.

151.  <u>Commonality</u>: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include

a.  whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' Private Information;

b.  whether Defendant had duties not to disclose the Plaintiff's and Class Members' Private Information to unauthorized third parties;

c.  whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for non-healthcare purposes;

d.  whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for unauthorized purposes;

e.  whether Defendant failed to adequately safeguard Plaintiff's and Class Members' Private Information;

f.  whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g.  whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h.  whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;

i.  whether Defendant engaged in unfair, unlawful, or deceptive practices by misrepresenting that it would safeguard Plaintiff's and Class Members' Private

36

Information.

152.    Typicality: Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use and incorporation of Meta Pixel and other tracking technology.

153.    Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

154.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered is typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

155.    Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the

adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

156.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

157.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

158.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

159.    Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure and failure to properly secure the Private Information of Class Members,

Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Member, and Defendant may continue to act unlawfully as set forth in this Complaint.

160.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

161.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

    a.   whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    b.   whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c.   whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

    d.   whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

    e.   whether Defendant breached the implied contract;

    f.   whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been used and disclosed to third parties;

    g.   whether Defendant failed to implement and maintain reasonable security procedures and practices;

    h.   whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to

safeguard Plaintiff's and Class Members' Private Information; and

i.  whether Plaintiff and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

162.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

163.    Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

164.    Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

165.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiff's and Class Members' Private Information.

166.    Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way

of data harvesting, advertising, and increased sales.

167.    Defendant breached its duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiff and Class Members. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

168.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

169.    Defendant's breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's negligence. These injuries are ongoing, imminent, immediate, and continuing.

## COUNT II
## INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Class)

170.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

171.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via their Website and Online Platforms.

172.    Plaintiff and Class Members communicated sensitive PHI and PII—Private

41

Information—that they intended for only Defendant to receive and that they understood Defendant would keep private.

173.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion and their private affairs and concerns.

174.    Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's representations in their privacy policy. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of PHI coupled with PII is highly offensive to the reasonable person.

175.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

176.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

177.    Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of their intrusions upon Plaintiff's and Class Members' privacy.

178.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

179.    Plaintiff also seeks such other relief as the Court may deem just and proper.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Class)

180.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

181.    As a condition of receiving medical care from Defendant, Plaintiff and the Class provided their Private Information and paid compensation for the treatment received. In so doing, Plaintiff and the Class entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in their Privacy Policy and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

182.    Implicit in the agreement between Genesis Health and its patients, Plaintiff and the proposed Class Members, was the obligation that both parties would maintain the Private Information confidentially and securely.

183.    Genesis Health had an implied duty of good faith to ensure that the Private Information of Plaintiff and Class Members in its possession was only used only as authorized, such as to provide medical treatment, billing, and other medical benefits from Genesis Health.

184.    Genesis Health had an implied duty to protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses.

185.    Additionally, Genesis Health implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

186.    Plaintiff and Class Members fully performed their obligations under the implied contract with Genesis Health. Genesis Health did not. Plaintiff and Class Members would not have provided their confidential Private Information to Genesis Health in the absence of their implied

contracts with Genesis Health and would have instead retained the opportunity to control their Private Information for uses other than receiving medical treatment from Genesis Health.

187.    Genesis Health breached the implied contracts with Plaintiff and Class members by disclosing Plaintiff's and Class Members' Private Information to an unauthorized third party.

188.    Genesis Health's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Private Information in exchange for medical treatment and benefits.

189.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

190.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

191.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

192.    This claim is pleaded solely in the alternative to Plaintiff's Breach of Implied Contract claim.

193.    Plaintiff and Class members conferred a monetary benefit upon Genesis Health in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a

benefit on Defendant in the form of monetary compensation.

194.    Plaintiff and Class Members would not have used Genesis Health's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Private Information to third parties.

195.    Genesis Health appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class members.

196.    As a result of Genesis Health's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

197.    The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members themselves. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

198.    Genesis Health should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Disclosure alleged herein.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Class)

199.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

200.    A relationship existed between Plaintiff and the Class, on the one hand, and

Defendant, on the other, in which Plaintiff and the Class put their trust in Defendant to protect the Private Information of Plaintiff and the Class, and Defendant accepted that trust.

201.    Defendant breached the fiduciary duty that they owed to Plaintiff and the Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, their Private Information.

202.    Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damage to Plaintiff and the Class.

203.    But for Defendant's breach of fiduciary duty, the injury-in-fact and damage to Plaintiff and the Class would not have occurred.

204.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to the Plaintiff and the Class.

205.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

**COUNT VI**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE**
**PRACTICES ACT, 815 Ill. Comp. Stat. § 505/1 *et seq.***
**(On Behalf of Plaintiffs and the Illinois Subclass)**

206.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

207.    The Illinois Consumer Fraud and Deceptive Practices Act ("CFDPA") makes it unlawful to employ "[u]nfair methods of competitions and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with

intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in [this section] . . . in the conduct of any trade or commerce." 815 Ill. Comp. Stat. Ann. 505/2.

208.    Defendant was engaged "in the conduct of trade or commerce" by hosting and publishing its Website that they encouraged their patients to use and where they advertised their healthcare services to the public. *Id.*

209.    Genesis Health used unfair and deceptive acts or practices in the conduct of trade or commerce, including but not limited to the following.

    a.  Defendant encouraged its patients to use its Website and Online Platforms while representing its commitment to protecting the privacy of their Personal Information. Meanwhile, Defendant shared Plaintiff and Class Members' Private Information with Facebook and possible others, without Plaintiff and Class Members' knowledge or consent.

    b.  Defendant promised that it would not use Plaintiff and Class Members' PHI to send them marketing information prior to obtaining their written permission. At the same time, Defendant knowingly collected Plaintiff's and Class Members' private information for marketing purposes. On information and belief, Defendant then used this information to market its services to Plaintiff and Class Members and thereby increase its profits.

    c.  Plaintiff and Class Members relied on Genesis Health's representations in using Genesis Health's Online Platform and thought they were communicating only with their trusted healthcare provider. In actuality, Defendant was surreptitiously intercepting and transmitting Plaintiff's and Class Member's communications from

Plaintiff's and Class Members' browsers directly to Facebook.

210.    Genesis Health's Disclosure of Plaintiff and Class Members' Private Information was willful, knowing, and done with intent that Plaintiff and Class Members rely upon the concealment, suppression or omission of a material fact: that Genesis Health was tracking Plaintiff's and Class Members' Private Information, using it for advertising purposes without their permission, and disclosing that information to unauthorized third parties.

211.    The CFDPA provides that "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper." 815 Ill. Comp. Stat. Ann. 505/10a(a). Further, "the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party." *Id.* at 505/10a(b).

212.    Had Plaintiff and members of the Classes been aware that their Private Information would be transmitted to unauthorized third parties, they would not have entered into such transactions and would not have provided payment or confidential medical information to Genesis Health.

213.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices in violation of the CFDPA, Plaintiff and Class Members have suffered damages for which Defendant is liable, including, but not limited to, the following.

    a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private.

    b.    Defendant eroded the essential confidential nature of the doctor-patient relationship.

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality.

e. Defendant's actions diminished the value of Plaintiffs' and Class Members' personal information.

214.     Plaintiff and Class Members seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the CFDPA. As redress for Defendant's repeated and ongoing violations, Plaintiff and Class Members are entitled to, *inter alia*, actual damages, reasonable attorneys' fees and costs, and injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Jane Doe, Individually, and on behalf of all others similarly situated, prays for judgment as follows:

A.     for an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B.     for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.     for equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and

49

unlawfully disclosed to third parties;

D.      for equitable relief requiring restitution and disgorgement of the revenues
        wrongfully retained as a result of Defendant's wrongful conduct;

E.      ordering Defendant to pay for not less than three years of credit monitoring
        services for Plaintiff and the Class;

F.      for an award of actual damages, compensatory damages, statutory damages, and
        statutory penalties, in an amount to be determined, as allowable by law;

G.      for an award of punitive damages, as allowable by law;

H.      for an award of reasonable attorneys' fees and costs under the CFDPA, the
        common fund doctrine, and any other applicable law;

I.      costs and any other expenses, including expert witness fees incurred by Plaintiff
        in connection with this action;

J.      pre- and post-judgment interest on any amounts awarded; and

K.      such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiff, by counsel, hereby demands a trial by jury on all issues so triable.

Dated: 11/21/2023                     Respectfully submitted,

                                      _____/s/ Lynn A. Toops_____
                                      Lynn A. Toops (No. 63337-43)
                                      Amina A. Thomas (*Pro Hac Vice* forthcoming)
                                      Mary Kate Dugan (*Pro Hac Vice* forthcoming)
                                      COHEN & MALAD, LLP
                                      One Indiana Square, Suite 1400
                                      Indianapolis, Indiana 46204
                                      (317) 636-6481
                                      ltoops@cohenandmalad.com
                                      athomas@cohenandmalad.com
                                      mdugan@cohenandmalad.com

50

J. Gerard Stranch, IV (*Pro Hac Vice* forthcoming)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com
raina@turkestrauss.com

***Counsel for Plaintiff and the Proposed Class***